FILED
2014 Jul-25  PM 03:05
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

```
LYNN GORDON,                    )
                                )
          Plaintiff,            )
                                )
     v.                         ) Case No.  4:12-CV-1625-WMA
                                )
CAROLYN W. COLVIN,              )
Acting Commissioner of Social   )
Security,                       )
                                )
          Defendant.            )
```

**<u>MEMORANDUM OPINION</u>**

Lynn Gordon, plaintiff, brings this action seeking judicial review of a final adverse decision of the Commissioner of the Social Security Administration denying her applications for disability insurance benefits and Supplemental Security Income. Gordon timely pursued and exhausted her administrative remedies. Accordingly, this case is now ripe for judicial review under 42 U.S.C. § 405(g). Based on the court's review of the record and the briefs submitted by the parties, the court finds that the decision of the Commissioner is due to be affirmed.

**BACKGROUND**

Gordon filed applications for disability insurance benefits and Supplemental Security Income (SSI) on April 9, 2008, and alleges she became disabled on April 2, 2007. R. 35. Gordon was 48 years old at the time of the ALJ's decision. R. 43. She has a high school education, and past relevant work as a fast food worker, retail assistant manager, office clerk/clerical worker,

department manager, floor manager, accounting clerk, sewing machine operator, knitting machine operator, and cashier/checker.  R. 42. Gordon testified she is unable to work primarily due to depression and panic attacks rather than physical problems.  R. 140, 142.  She also testified that she had pain caused by shingles and side effects from her medications.  R. 146-47.  She testified that she had neck and shoulder pain that affected her ability to lift with her right arm.  R. 150-51.

The medical treatment records show Gordon received treatment for her mental impairments at the CED Mental Health center from March 2009 through August 2009.  R. 315-34, 340-41.  During that time, she received individual therapy and was prescribed medications to treat her condition.  She also received treatment for her joint and neck pain at Quality of Life Health Services on May 27 and July 8, 2008.  R. 308-14.  She was prescribed pain medications, which she reported improved her pain.  R. 308.

After the ALJ's decision, Gordon submitted additional medical records to the Appeals Council.  Those records contained a consultative mental examination dated January 12, 2010, and a consultative physical examination dated March 18, 2010.  R. 363-69, 386-392.  The evidence submitted to the Appeals council also contained treatment records from the CED Mental Health Center, and from Quality of Life Health Services.  R. 371-85, 451-56.  A more

detailed description of this evidence is provided, to the extent it is legally significant, in the sections that follow.

**DISCUSSION**

### Standard of Review

The sole function of this court is to determine whether the decision of the Commissioner is supported by substantial evidence and whether proper legal standards were applied. *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).  To that end, this court "must scrutinize the record as a whole to determine if the decision reached is reasonable and supported by substantial evidence." *Id.* (citations omitted).  Substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.*  This court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. *Id.* Even if the court finds that the evidence preponderates against the Commissioner's decision, the court must affirm if the decision is supported by substantial evidence. *Id.*

Unlike the deferential review standard applied to the Commissioner's factual findings, "no similar presumption of validity attaches to the [Commissioner's] conclusions of law, including determination of the proper standards to be applied in reviewing claims." *Wiggins v. Schweiker*, 679 F.2d 1387, 1389 (11th Cir. 1982) (quoting *Smith v. Schweiker*, 646 F.2d , 1075, 1076 (5th

Cir. Unit A Jun.1981)).  Therefore, this court reviews de novo the Commissioner's conclusions of law.  *Ingram v. Comm'r of Soc. Sec.*, 496 F.3d 1253, 1260 (11th Cir. 2007).  The Commissioner's "failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal."  *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

### *Statutory and Regulatory Framework*

To qualify for disability benefits, a claimant must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  A "physical or mental impairment" is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

Social Security regulations outline a five-step process that the Commissioner uses to determine whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v).  The Commissioner must determine in sequence:

> (1)  whether the claimant is currently engaged in substantial gainful activity;

(2)   whether the claimant has a severe impairment or combination of impairments;

(3)   whether the claimant's impairment meets or equals the severity of an impairment in the Listing of Impairments;[1]

(4)   whether the claimant can perform any of his or her past work; and

(5)   whether there are significant numbers of jobs in the national economy that the claimant can perform.

*Winschel v. Comm'r of Soc. Sec*, 631 F.3d 1176, 1178 (11th Cir. 2011). The evaluation process continues until the Commissioner can determine whether the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). A claimant who is doing substantial gainful activity will be found not disabled at step one. 20 C.F.R. §§ 404.1520 (a)(i), 416.920(a)(4)(i). A claimant who does not have a severe impairment will be found not disabled at step two. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). A claimant with an impairment that meets or equals one in the Listing of Impairments will be found disabled at step three. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

Prior to considering steps four and five, the Commissioner must assess the claimant's residual functional capacity (RFC), which will be used to determine the claimant's ability to work. 20

---

[1]   The Listing of Impairments, ("Listings") found at 20 C.F.R. Part 404, Subpart P, Appendix 1, are used to make determinations of disability based upon the presence of impairments that are considered severe enough to prevent a person from doing any gainful activity. 20 C.F.R. § 404.1525.

C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).   A claimant who can perform past relevant work will be found not disabled at step four. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).   At step five the burden shifts to the Commissioner to show other work the claimant can do.   *Foot v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995).   To satisfy this burden the Commissioner must produce evidence of work in the national economy that the claimant can do based on the claimant's RFC, age, education, and work experience. 20 C.F.R. §§ 404.1512(f), 416.912(f).   A claimant who can do other work will be found not disabled at step five.   20 C.F.R. §§ 404.1520(a)(4)(v), 416.920 (a)(4)(v).   A claimant who cannot do other work will be found disabled.   *Id.*

### *Analysis*

In the present case, the Administrative Law Judge (ALJ) determined Gordon was not engaged in substantial gainful activity, and found that her cervical disc disease, depressive disorder, panic disorder, and trichotillomania[2] were severe impairments.   R. 37.   He concluded Gordon did not suffer from a listed impairment. R. 38.   The ALJ found Gordon had the residual functional capacity (RFC) to perform "medium work as defined in 20 CFR 404.1567(c) and 416.967(c)," except she was to avoid climbing ladders, ropes or scaffolds.   R. 40.   She was also limited to frequently lifting

---

[2]   Trichotillomania is the "compulsive pulling out of one's hair."   *Dorland's Illustrated Medical Dictionary* 1743 (28th Edition).

6

overhead, and was to avoid all work place hazards.  R. 40.  The ALJ found Gordon was able to "understand, remember, and carryout simple instructions over an eight-hour work day; and concentrate for two hours at a time."  R. 40.  He also found she was "capable of casual contact with co-workers and supervisors; and can handle slow gradual changes in a work setting."  R. 40.  With this RFC, the ALJ found Gordon unable to perform her past relevant work.  R. 42.

When a claimant is not able to perform the full range of work at a particular exertional level, the Commissioner may not rely exclusively on the Medical-Vocational Guidelines ("the grids") to establish the presence of other jobs at step five.[3]  *Foote*, 67 F.3d at 1558-59.  The presence of a non-exertional impairment (such as pain, fatigue, or mental illness) also prevents exclusive reliance on the grids.  *Id.* at 1559.  In such cases "the [Commissioner] must seek expert vocational testimony."  *Id.*  Based on Gordon's RFC and the testimony of a vocational expert (VE), the ALJ found Gordon could perform other work in the national economy.  R. 43, 87-89.  Therefore, he found she was not disabled at step five of the sequential evaluation framework.  R. 44.

---

[3]   The Medical-Vocational Guidelines, found at 20 C.F.R. Part 404, Subpart P, Appendix 2, are used to make determinations of disability based upon vocational factors and the claimant's residual functional capacity when the claimant is unable to perform his vocationally relevant past work.  20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00(a).  Such determinations, however, are only conclusive when all of the criteria of a particular rule are met.  20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00(a).

Gordon challenges the ALJ's decision on five separate grounds: 1) whether the ALJ's RFC finding was supported by substantial evidence and made in accordance with the applicable legal standards; 2) whether the ALJ's hypothetical question to the vocational expert should have been based on a formal RFC assessment by either an examining or non-examining physician; 3) whether the Appeals Council failed to consider the new evidence submitted by Gordon; 4) whether the ALJ's decision that Gordon was not disabled under the Listings was based on substantial evidence when the evidence submitted to the Appeals Council was considered; and 5) whether an the evaluation by Dr. Prince submitted to the Appeals Council showed Gordon was disabled due to degenerative disk disease.

### 1. Substantial Evidence and Correct Standards

Gordon first argues that the ALJ's RFC finding "is simply conclusory and does not contain any rationale or reference to the supporting evidence, as required by SSR 96-8p." Pl.'s Br. 16. Gordon sets forth several requirements imposed by Social Security Ruling (SSR) 96-8p, which she presumably believes the ALJ did not comply with in assessing her RFC.

The SSR provides that "the RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities,

observations).'" SSR 96-8p at *7.  It also provides that the ALJ
must consider the claimant's symptoms and address any medical
source opinions in the record.  *Id.*  A review of the ALJ's decision
shows that it does contain such a narrative discussion.  R. 40-42.

The ALJ's narrative explained how the ALJ evaluated Gordon's
symptom-related functional limitations, and why he found her not
fully credible.  R. 40-41. He explained that Gordon's alleged
symptoms "are not fully supported by the medical evidence."  R. 41.
To support this finding, he observed that Dr. Yoyen Lau, a treating
physician, "consistently noted that the claimant's neck was supple
with no adenopathy or masses."  R. 41.  He also noted that Dr.
Stehr reported that during his examination Gordon "was comfortable
and able to get on and off the exam table without any notable
difficulty," and "had no pain behaviors."  R. 42.  He observed that
although Dr. Stehr found Gordon "had tender points in her cervical,
thoracic, and lumbar spine, he could not appreciate any increased
tone or spasms, and she had no effusion or crepitus of her
shoulders."  R. 42.  The ALJ further observed that the treatment
records from Quality of Life Health Services "noted that [Gordon's]
pain was relieved by prescribed medication."  R. 42.

As for Gordon's mental limitations, the ALJ noted that
treatment records from CED Mental Health Center showed Gordon "has
consistently received a global assessment of functioning (GAF)
rating from 60 to 62, which has steadily been increasing."  R. 42.

He observed that these scores represent either moderate or mild symptoms.  R. 42.  The ALJ also extensively discussed the mental health treatment records in considering whether Gordon met a Listing.

The ALJ concluded that although Gordon "does have some difficulties and limitation as can be seen within the medical evidence . . . the impact of these limitations, which can be reasonably attributed to the claimant's impairments, does not reach the disabling level."  R. 42.  To support this conclusion, he discussed Gordon's activities of daily living, and observed that she "functions independently, . . . performs some of the household chores, and provides for her own personal needs."  R. 42.  He also found that in the area of social functioning, Gordon had "a fiancé that she interacts with on a daily basis, and lives with her mother with whom she also interacts with on a daily basis."  R. 42.  The ALJ stated that he had "considered all the reasonable limitations that the claimant has in determining her residual functional capacity."  R. 42.

The ALJ discussed the medical source opinions in the record, and accorded significant weight to the opinions of the state agency consultants, finding them "consistent with the treating source records."  R. 42.  He also  considered the opinions from Gordon's treating sources, and noted "that no treating source opinion

supports disability and the treating source GAF ratings are inconsistent with disability." R. 42.

Gordon argues the ALJ failed to follow SSR 96-8p in finding that the claimant has minor physical limitations. Pl.'s Br. 17. However, the portion of SSR 96-8p relied upon by Gordon concerns situations where "there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction." SSR 96-8p. In the present case, the ALJ found Gordon had both physical and mental limitations, and explained the reasons for the work-related restrictions he assessed.

Gordon also points out that "SSR 96-8p requires that RFC assessments consider an individual'ss maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis." Pl.'s Br. 17. However, the ALJ recognized this requirement in his decision: "An individual's residual functional capacity is her ability to do physical and mental work activities on a sustained basis despite limitations from her impairments." R. 36. The ALJ also specifically cited SSR 96-8p in his discussion of the standards governing his assessment of Gordon's RFC. R. 37. There is nothing in the ALJ's decision indicating he assessed Gordon's RFC without considering her ability to do physical and mental work activities on a sustained basis.

In short, the ALJ properly followed SSR 96-8p in assessing Gordon's RFC.  His decision contains an extensive discussion of the evidence, and why it supported his RFC finding.  The ALJ's RFC finding was reasonable and based on substantial evidence.

**2.  Foundation Requirements for ALJ Hypothetical Question**

Gordon next argues that the ALJ's hypothetical question to the vocational expert must be based on a formal RFC assessment by either an examining or non-examining physician.  Pl.'s Br. 17.  In fact, there is a formal mental RFC assessment in the record from Dr. Leonard, a State agency reviewing medical consultant, and the ALJ specifically afforded it "significant weight," in assessing Gordon's RFC.  R. 290-93, 42.  Moreover, neither the Commissioner's regulations nor the law of this circuit require that an RFC be based upon a medical source statement from a doctor.

The regulations provide that opinions on issues reserved to the Commissioner, such as a claimant's RFC, are not medical opinions.

> Opinions on some issues, such as the examples that
> follow, are not medical opinions, . . . but are, instead,
> opinions on issues reserved to the Commissioner because
> they are administrative findings that are dispositive of
> a case; i.e., that would direct the determination or
> decision of disability.

§ 404.1527(d).  One of the specifically excluded examples is a claimant's RFC.

> Although we consider opinions from medical sources on
> issues such as . . . your residual functional capacity .

12

. . the final responsibility for deciding these issues is reserved to the Commissioner.

§ 404.1527(d)(2).  Therefore, under the regulations, a claimant's RFC is not a medical opinion, and a doctor's opinion was not required for the ALJ to assess Gordon's RFC.

The Eleventh Circuit has also recognized that determining a claimant's residual functional capacity and ability to work is a task for the ALJ, and not doctors.  *See Robinson v. Astrue*, 365 F. App'x 993, 999 (11th Cir. 2010) (unpublished) ("[T]he task of determining a claimant's residual functional capacity and ability to work is within the province of the ALJ, not of doctors.").  It has also found an ALJ's RFC finding can be supported by substantial evidence even if there is no medical source statement in the record.  In *Green v. Social Security Administration*, the court found the ALJ had properly refused to credit a Physical Capacities Evaluation ("PCE") from the claimant's treating physician.  223 F. App'x 915, 922-23 (11th Cir. 2007) (unpublished).  The court in *Green* rejected the claimant's argument that without that PCE, there was nothing in the record upon which the ALJ could base his RFC finding.  *Id.* at 923.  The court held that other evidence from the claimant's doctors (which did not contain a PCE or RFC assessment) was sufficient to support the ALJ's finding that the claimant could perform light work.  *Id.* at 923-24; *see also Langley v. Astrue*, 777 F Supp. 2d. 1250, 1258 (N.D. Ala. 2011) (holding RFC is not a medical opinion and need not be based upon a doctor's RFC opinion).

In the present case, there was sufficient medical and other evidence in the record to allow the ALJ to assess Gordon's RFC. Therefore, a formal physical RFC assessment from a doctor was not required.  Both the ALJ's RFC assessment, and his hypothetical question to the vocational expert based on that assessment, are supported by substantial evidence.

### 3.  New Evidence Before the Appeals Council

Gordon next argues that the evidence submitted to the Appeals Council showed she met "listing 12.04(c) and 12.06 due to depression and anxiety," and that an "evaluation by Dr. Prince . . . showed [she] was disabled due to degenerative disk disease." Pl.'s Br. 25.  Therefore, she argues, the Appeals Council either did not consider the evidence, or ignored evidence of disability, because it did not remand her claim.  *Id.*

Claimants may submit new evidence at each step of the administrative review process.  20 C.F.R. § 404.900(b) ("In each step of the review process, you may present any information you feel is helpful to your case.").  The Appeals Council is required to consider new and material evidence if it relates to the period on or before the ALJ's decision:

> If new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision.  The Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the period on or before the date of the administrative law judge hearing decision.

20 C.F.R. § 404.970(b).  If a claimant submits evidence that does not relate to the period on or before the ALJ's decision, the Appeals Council must return the evidence to the claimant.

> If you submit evidence which does not relate to the period on or before the date of the administrative law judge hearing decision, the Appeals Council will return the additional evidence to you with an explanation as to why it did not accept the additional evidence and will advise you of your right to file a new application.

20 C.F.R. § 404.976(b).

When a claimant submits new evidence to the Appeals Council, the regulations require the Appeals Council to "review the case if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record."  20 C.F.R. § 404.970(b).

In the present case, the Appeals Council considered the new evidence, but found it did not provide a basis for changing the ALJ's decision.  R. 2.  Therefore, Gordon's argument that the Appeals Council ignored or failed to consider her evidence is without merit.

### 4.  Substantial Evidence of Disability Under the Listings

Gordon argues the ALJ's decision was not based on substantial evidence when the evidence submitted to the Appeals Council was considered because it shows she is disabled under Listings 12.04 (Affective Disorder) and 12.06 (Anxiety Related Disorder).  Pl.'s Br. 13.  She also argues the Appeals Council erred in not remanding her claim.  Pl.'s Br. 14.

15

"When a claimant properly presents new evidence to the AC and it denies review, [a reviewing court] essentially consider[s] the claimant's evidence anew to determine whether 'that new evidence renders the denial of benefits erroneous.'" *Levie v. Comm'r of Soc. Sec.*, 514 F. App'x. 829, 832 (11th Cir. 2013) (unpublished) (quoting *Ingram v. Comm'r of Soc. Sec.*, 496 F.3d 1253, 1262 (11th Cir.2007). Therefore, this court must consider the record as a whole, including the evidence submitted to the Appeals Council, to determine whether the final decision of the Commissioner is supported by substantial evidence. *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1266 (11th Cir. 2007). The court will first consider whether the ALJ's finding was supported by substantial evidence in the record at the time of his decision, and then determine whether the additional evidence submitted to the Appeals Council renders that decision erroneous.

The burden is on Gordon to show that her impairments meet a listed impairment. *Barron v. Sullivan*, 924 F.2d 227, 229 (11th Cir. 1991). The regulations also provide that Gordon "must furnish medical and other evidence that [the Commissioner] can use to reach conclusions about [her] medical impairment(s) . . . ." 20 C.F.R. § 404.1512(a). To meet a Listing Gordon's impairment must "meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does

not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)(emphasis in original).

Gordon can meet Listing 12.04 or Listing 12.06, by showing that she satisfies the criteria in paragraphs A and B of those listings. 20 C.F.R. Pt. 404, Subpt. P, App. 1 (hereinafter "Listing(s)") §§ 12.04, 12.06. Alternately, Gordon may show she meets these Listings by satisfying the criteria of paragraph C of Listing 12.04, or paragraphs A and C of Listing 12.06.

The A criteria of the Listings set forth clinical findings that medically substantiate a mental disorder. Listing 12.00A. The criteria in paragraphs B and C describe functional limitations that would prevent any gainful activity. *Id.*

To satisfy the B criteria of either Listing 12.04 or 12.06, Gordon must establish she has at least two of the following limitations: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration. *Id.*

To satisfy the C criteria of Listing 12.04, Gordon must have one of the following: (1) repeated episodes of decompensation, each of extended duration; (2) a residual disease that has resulted in such marginal adjustment that even minimal increase in mental demands or change in the environment would be predicted to cause

17

the individual to decompensate; or (3) a current history of one or more years' inability to function outside a highly supportive living arrangement with a need for such an arrangement to continue. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.04.  For Listing 12.06, the "C" criteria requires that the mental impairment results in the "complete inability to function independently outside the area of one's home."  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.06.

Substantial evidence supports the ALJ's findings that Gordon's mental impairments did not cause "marked" limitations in two of the paragraph "B" criteria required to meet Listing 12.04 or 12.06.  R. 39.  The ALJ found Gordon had only moderate limitations in activities of daily living.  R. 39.  To support this finding, the ALJ noted Dr. Bentley, a consultative psychological examiner, noted Gordon attended church, socialized with a few friends, enjoyed caring for her dog, and completed her activities of daily living without assistance.  R. 273.  The ALJ also observed that Dr. Stehr, a consultative physical examiner, reported Gordon was "100% independent [in] all activities of daily living."  R. 39, 276.  Dr. Stehr further noted Gordon could do light housework such as cleaning, cooking, and doing laundry.  R. 276.

In the area of social functioning, the ALJ also found Gordon had moderate limitations.  R. 39.  To support his finding, the ALJ noted Gordon testified she lived with her mother and fiancé, and that she gets out of the house once or twice a week.  R. 39.  He

18

also noted she visits her children and grandchild.  R. 39.  The ALJ further observed that Dr. Leonard, a state agency psychological consultant, determined Gordon could have contact with co-workers, supervisors, and the general public that is casual and non-confrontational.  R. 293.

In the areas of concentration, persistence or pace, the ALJ found Gordon had moderate limitations.  R. 39.  Supporting his finding, the ALJ noted Gordon's past relevant work was in semiskilled and skilled positions.  R. 39.  He also noted that Dr. Bentley determined she was capable of managing her own funds.  R. 274.  After reviewing the medical evidence, Dr. Leonard, a State agency medical consultant, determined Gordon had the ability to understand, remember and carry out simple instructions, and to concentrate for two hours.  R. 293.  Dr. Leonard's opinion provides additional evidence to support the ALJ's finding.

The medical records do not document any episodes of decompensation of extended duration, and Gordon does not argue that she has suffered such episodes.  Therefore, there was substantial evidence in the record to support the ALJ's finding that Gordon did not satisfy the B criteria of either Listing 12.04 or 12.06.

The ALJ also reasonably found Gordon did not meet the C criteria of listing 12.04, because there is no evidence showing Gordon had either repeated episodes of decompensation, a residual disease process that had resulted in such marginal adjustment that

even a minimal increase in mental demands or change in the environment would be predicted to cause her to decompensate, or a current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of the continued need for such an arrangement. *See* Listing 12.04C; R. 271-75, 293, 315-25, 329-33, 340-41. His finding that, the C criterion of 12.06 was not met is also reasonable because the evidence does not show Gordon's impairment resulted in a complete inability to function independently outside the area of her home. *See* Listing 12.06C; R. 271-75, 293, 315-25, 329-33, 340-41.

To support her argument that her depression and anxiety meet Listings 12.04 and 12.06, Gordon cites to diagnoses of depression and anxiety. Pl's Br. 21- 23. However, merely being diagnosed with these conditions does not establish that her mental impairments interfered with her ability to perform basic work activities. *See Wind v. Barnhart*, 133 F. App'x 684, 690 (11th Cir. 2005) (unpublished) (citing *McCruter v. Bowen*, 791 F.2d 1544, 1547 (11th Cir.1986) ("[A] diagnosis or a mere showing of 'a deviation from purely medical standards of bodily perfection or normality' is insufficient; instead, the claimant must show the effect of the impairment on her ability to work.").

Moreover, the treatment records show medication was helping Gordon's mental condition, and that she was doing well. R. 320-21. Also, Dr. Bentley noted in May 2008 that Gordon did not appear to

be in any distress; had no difficulties with receptive and expressive communication; and did not exhibit any phobias, obsessions, or unusual behavior.  R. 272.  He also noted that her mood was cheerful, and that she showed no indication of excessive anxiety or restlessness.  R. 272.

The mental health treatment records also show Gordon was assessed with GAF scores showing that her mental impairment caused mild to moderate symptoms during her treatment at the CED Mental Health Center.  She was initially assessed with a GAF score of 60 on March 23, 2009, and also received a GAF score of 60 on May 19, 2009.[4]  R. 325, 322.  However, on June 18, July 16, and August 18, 2009, her GAF score was 62.[5]  R. 320, 315, 341.  These GAF scores provide additional evidence supporting the ALJ's finding that Gordon's impairment did not meet the B or C criteria of Listings 12.04 and 12.06.

---

[4]  The Global Assessment of Functioning (GAF) Scale is used to report an individual's overall level of functioning.  Diagnostic and Statistical Manual of Mental Disorders 32 (4th Edition, Text Revision) ("DSM-IV-TR").  A rating of 51-60 reflects: "**Moderate symptoms** (e.g., flat affect and circumstantial speech, occasional panic attacks) **OR moderate difficulty in social, occupational, or school functioning** (e.g., few friends, conflicts with peers or co-workers.)"  DSM-IV-TR at 34 (emphasis in original).

[5]  A GAF of 61-70 indicates:  "**Some mild symptoms** (e.g., depressed mood and mild insomnia), **OR some difficulty in social, occupational, or school functioning** (e.g., occasional truancy, or theft within the household), **but generally functioning pretty well, with some meaningful interpersonal relationships.**" DSM-IV-TR at 34 (emphasis in original).

When considered as a whole, there was substantial evidence in the record to support the ALJ's finding that Gordon did not meet a Listing.  This evidence included the treatment records from CED Mental Health Center, Dr. Bentley's consultative examination, the State agency medical consultant's report, and Gordon's report of her daily activities.

The evidence submitted to the Appeals Council does not render the ALJ's findings erroneous.  It shows Gordon continued to be treated at the CED Mental Health Center after the date of the ALJ's decision.  On January 11, 2010, she reported that her crying spells had almost stopped, and she was assessed with a GAF score of 62.

Also, after the ALJ rendered his decision, Gordon's attorney referred her to Dr. Wilson for a psychological evaluation on January 12, 2010.  Dr. Wilson found Gordon's affect was within normal limits, but that she "did appear to be depressed."  R. 366. He found that her mental control, concentration, and abstract reasoning were adequate.  R. 366.  In his summary, Dr. Wilson noted Gordon reported that her medications gave her "some benefit," but that "she still struggles with depression, panic and trichotillomania."  R. 367.  He stated that she also had some medical problems and chronic pain.  R. 367.  He opined that "the combination of all of these problems would make it unlikely that

she could maintain employment," and assessed a GAF score of 48.[6]
R. 367.

Although Dr. Wilson's report provides some evidence to support
Gordon's claim that she meets Listings 12.04 and 12.06, there is
other substantial evidence in the record, including evidence
submitted to the Appeals Council that supports the ALJ's
determination that those Listings were not met.  For example, Dr.
Wilson's GAF assessment and Mental Health Source Statement are
contradicted by the GAF score of 62 reported just one day before
his evaluation by Gordon's treating mental health provider.  In
addition, Dr. Wilson's opinion that Gordon's "problems would make
it unlikely that she could maintain employment" is not a medical
opinion under the regulations.  *See Denomme v. Commissioner, Social
Sec. Admin.*  518 F. App'x 875, 878 (11th Cir. 2013) (finding
doctor's statement that claimant's condition would "likely prevent
her from maintaining gainful employment" was not a medical
assessment) (citing 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1)).
Therefore, the ALJ's finding that Gordon did not meet a Listing is
not rendered erroneous by the new evidence submitted to the Appeal
Council.

---

[6]  A GAF of 41-50 indicates:  **Serious symptoms** (e.g.,
suicidal ideation, severe obsessional rituals, frequent
shoplifting) **or any serious impairment in social, occupational,
or school functioning** (e.g., no friends, unable to keep a job)."
DSM-IV at 32 (emphasis in original).

### 5.  Consistency with the Opinion of Dr. Prince

Finally, Gordon argues that an "evaluation by Dr. Prince . . . showed [Gordon] was disabled due to degenerative disk disease." Pl.'s Br. 25.  Therefore, she argues the Appeals Council erred in not remanding her case.  *Id.*

Dr. Prince's examined Gordon at the request of her attorney on March 18, 1010, over four months after the ALJ's decision. R. 386-92.  On physical examination, he found dysesthesias and paresthesias in the right arm, a reduced range of motion in the cervical spine, tenderness in the right trapezius, and crepitus in the right shoulder. R. 388. Dr. Prince's assessment was "[t]otal, complete, and permanent disability secondary to chronic major mental illness with depression, major phobic reaction, and chronic pain with cervical C5-C6 radiculitis." R. 389.  He also completed a Physical Capacities Form, which indicated Gordon would be unable to sustain full time work.  R. 390-91.

The ALJ relied upon the consultative examination of Dr. Stehr and notes from Gordon's treating doctors in assessing her physical RFC.  The medical records available to the ALJ did not show Gordon sought treatment for her neck or shoulder pain after July 8, 2008, when she was seen at Quality of Life Health Services.  On that date, she reported that her pain had improved since she began taking prescription medications.  R. 308.  Additional treatment notes from Quality of Life Health Services submitted to the Appeals

24

Council show Gordon was seen on May 11, 2009, complaining of shoulder pain and ear discomfort. R. 451. That note also states that Gordon's pain was relieved by her medications. R. 451. The musculoskeletal physical examination showed tenderness in the cervical spine, and right shoulder and elbow tenderness. R. 452. The Appeals Council evidence also shows Gordon sought treatment for a headache and joint pain on August 7, 2009. R. 454. The musculoskeletal examination showed cervical spine tenderness, with bilateral shoulder tenderness. R. 455. These additional treatment notes from Quality of Life Health Services do not show Gordon's degenerative joint disease was appreciably worse than the treatment notes available to the ALJ. They also show Gordon sought treatment for her physical impairments on a sporadic basis, which provides substantial evidence to support the ALJ's finding that her physical impairments were not disabling prior to the date of his decision.

In addition, Dr. Prince's report indicates Gordon's primary problem was her mental impairment, which was not his specialty. He did not examine or have a treating relationship with Gordon, and his one time consultative examination was conducted four months after the ALJ's decision. He did not state that his findings reflected Gordon's condition as of the date of the ALJ's decision. Therefore, even if his opinions accurately reflected Gordon's physical impairments at the time of the examination, they would not relate to Gordon's condition at the time of the ALJ's decision.

For these reasons, neither Dr. Prince's examination and opinion, nor the other evidence submitted to the Appeals Council, renders the ALJ's physical RFC findings erroneous. His RFC finding is reasonable and supported by substantial evidence even when the new evidence is considered.

**CONCLUSION**

The court concludes the ALJ's determination that Gordon is not disabled is supported by substantial evidence, and that the ALJ applied the proper legal standards in arriving at this decision. Accordingly, the Commissioner's final decision is due to be affirmed. An appropriate order will be entered.

DONE this 25th day of July, 2014.


WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE